## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **GENERAL MOTORS CORPORATION**, a Delaware corporation, | **DISPOSITIVE MOTION** |
| *Plaintiff*, | **PLAINTIFF GM'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
| vs. | |
| **PHAT CAT CARTS, INC.,** a Florida corporation, **BRIAN WILSON,** an individual, | No. 8:06-CV-900-T-24MSS |
| *Defendants*. | |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to *Fed. R. Civ. P.* 56, Plaintiff General Motors Corporation ("GM") moves the Court for summary judgment against defendants Phat Cat Carts, Inc. ("Phat Cat") and Brian Wilson[1] with respect to all Claims alleged in GM's Amended Verified Complaint, specifically Federal Trademark Dilution under 15 U.S.C. § 1125(c), Federal Trademark Counterfeiting and Infringement under 15 U.S.C. § 1114, False Designation and False Advertising under 15 U.S.C. § 1125(a), and common law trademark infringement and unfair competition.

As set forth below, there are no factual disputes regarding GM's trademark and trade

---

[1] Simultaneously with this motion, GM has submitted a motion for leave to file an Amended Complaint, which adds Brian Wilson as a defendant to GM's existing claims. This motion for summary judgment is premised on the assumption that leave to file the Amended Verified Complaint will be granted and that Brian Wilson will be added as a defendant. In any event, the grounds for Phat Cat's liability are virtually coextensive with the grounds for Wilson's liability, and the arguments herein apply with equal force to both defendants. Specifically, and as explained in greater detail in GM's motion for leave to amend, defendant Wilson is individually liable for Phat Cat's infringement and dilution of GM's trademarks and trade dress on the basis of the undisputed fact that Wilson is the active force behind Phat Cat's acts of infringement. *See Chanel, Inc. v. Italian Activewear of Florida*, 931 F.2d 1472, 1477 (11th Cir. 1991) ("If an individual actively and knowingly caused the infringement, he is personally liable.").

dress rights, or regarding defendants' repeated and willful infringement and dilution of GM's rights. Therefore, GM respectfully requests that the Court enter summary judgment against defendants and award GM the following relief:

- The entry of a permanent injunction against defendants Phat Cat Carts, Inc. and Brian Wilson in substantially the same form as the Preliminary Injunction Order entered by the Court in this case (Doc. 49) on November 1, 2006;

- An award of GM's damages trebled or in an amount equal to defendants' wrongful profits trebled, pursuant to 15 U.S.C. § 1117;

- An award of GM's attorneys' fees and costs incurred in this action, pursuant to 15 U.S.C. § 1117.

This Motion is supported by GM's Brief In Support Of Motion For Summary Judgment and the Declarations and Exhibits submitted concurrently here.

## BRIEF IN SUPPORT OF PLAINTIFF GM'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In this action, GM asserts claims for infringement and dilution of GM's world-famous trademarks and of the "trade dress" or distinctive body shapes and styles of GM's vehicles. Defendants manufacture, advertise, and sell golf carts that include knockoffs of a number of distinctive GM automobiles. The knockoff golf carts are carefully crafted to misappropriate the shape and design of GM's vehicles. They also bear counterfeits of GM's registered trademarks such as the HUMMER®, CHEVROLET®, CHEVY®, BEL AIR®, and MONTE CARLO®, and others. Defendants use counterfeits of genuine GM trademarks not only on their golf carts, but also in their promotional materials and Internet website.

### STATEMENT OF UNDISPUTED FACTS

The following facts have been established by GM's Verified Complaint and exhibits (Doc. 1), Defendants' Answer (Doc. 17), the deposition testimony of defendant Brian Wilson,[2] and Declaration of Robert Wells ("Wells Decl.") attached here as Exhibit A.

1.     GM is a Delaware corporation with its principal place of business in Detroit, Michigan.  [Doc. 1, Ver. Compl. ¶ 4]

2.     Defendant Phat Cat Carts, Inc. is a Florida corporation with its principal place of business in Clearwater, Florida. [Doc. 1, Ver. Compl. ¶ 5]

3.     Brian Wilson is president and sole owner of Phat Cat Carts, Inc. [Ex. B, BWI:12-13, 29-30]

### Facts Regarding GM's HUMMER® Trademark and Trade Dress Rights

4.     As the owner of the HUMMER® trademark and of the distinctive non-functional design and trade dress of HUMMER® vehicles, GM has the right to enforce such trademark and trade dress rights.  GM and its designated HUMMER® dealers sell HUMMER® vehicles and genuine HUMMER® parts and accessories (collectively hereafter "Hummer Products") throughout the world.  Continually since 1981, GM and its predecessors in interest have used the HUMMER® trademark, service mark, and trade dress (including the inherently distinctive and non-functional shape of the world-famous automobiles known as "HUMMERS"), developed and owned by GM, in connection with the sale, distribution, maintenance, service, and repair of Hummer Products. [Doc. 1, Ver. Compl. ¶ 8]

5.     GM began producing the HUMMER® H2® in 2002.  The HUMMER® H2® is depicted below.  [Doc. 1, Ver. Compl. ¶ 10]

---

[2] Brian Wilson was deposed both in his individual and corporate capacities. GM will refer to these as BWI and BWC, respectively, followed by a colon and page number.  Relevant excerpts of BWI and BWC are attached hereto as Exhibits B and C, respectively.



6.      GM has acquired trademark rights in the trade dress of the inherently distinctive

vehicle body shapes of Hummer Products, which are recognized throughout the world.  These

distinctive shapes function as trademarks.  In addition, GM has obtained United States trademark

registrations for the word mark HUMMER®.  These registrations are valid, unrevoked,

subsisting, and incontestable, and constitute *prima facie* evidence of GM's exclusive ownership

of the Hummer Marks.  GM's trademark registrations include among others: (a) U.S.

Registration No. 1,730,936, registered on November 10, 1992, for the word HUMMER for use

with automobiles and parts thereof; and (b) U.S. Registration No. 1,959,544, registered as a

trademark for the shape and configuration of a vehicle's nose, including the grill area and

adjacent panels.  [Doc. 1, Ver. Compl. ¶ 13]  The trademarks, service marks, and trade dress of

Hummer Products are hereinafter collectively referred to as the "Hummer Marks."

7.      As the owner of the Hummer Marks, GM has the right to enforce such trademark

and trade dress rights.  The non-functional nature of the design and trade dress of HUMMER®

vehicles is evident from the numerous alternative golf car designs available on the market.

Websites selling custom golf cars with non-infringing designs include:

WESTERGOLFCAR.COM; EDDSGOLFCARTS.COM; DIVERSIFIEDGOLFCARS.COM;

STRETCHPLASTICS.COM; CLUBCAR.COM; RAINCUSTOM.ZOOVY.COM;

TNTGOLFCAR.COM; and STREETRODPRODUCTIONS.COM.  [Doc. 1, Ver. Compl. ¶ 14]

8.      GM and its predecessors have extensively employed, and caused to be advertised and publicized throughout the world, the Hummer Marks to identify Hummer Products and services.  The distinctive design and shape of HUMMER® vehicles are immediately identifiable and associated by the general public with the Hummer Marks and with GM, and have thus acquired secondary meaning. [Doc. 1, Ver. Compl. ¶ 15]

9.      GM and its predecessors have spent millions of dollars and have expended significant effort in advertising and promoting authorized Hummer Products and services and in developing the Hummer Marks throughout the world.  GM prominently displays the Hummer Marks including the trade dress of the distinctively shaped HUMMER® vehicles in its advertisements.  As a result of such advertising and expenditures, GM has established considerable goodwill in the Hummer Marks, and the Hummer Marks have become widely known and famous.  [Doc. 1, Ver. Compl. ¶ 16]

10.      GM and its authorized dealers and licensees are the only parties authorized to use the Hummer Marks in connection with the sale, distribution, or advertising of any products and services.  [Doc. 1, Ver. Compl. ¶ 17]

### *GM's Trademark and Trade Dress Rights to CHEVROLET® and CHEVROLET® Vehicles*

11.      GM first registered the trademark CHEVROLET®, U.S. Registration No. 216,070, with the United States Patent and Trademark office in 1924, and has since obtained numerous other registrations for that mark. GM and its designated CHEVROLET® dealers sell CHEVROLET® vehicles and genuine CHEVROLET® parts and accessories (collectively hereafter "Chevrolet Products") throughout the world.  GM and its designated CHEVROLET® dealers are the only authorized providers of Chevrolet Products and vehicle maintenance services

under the CHEVROLET® name, trademarks, and trade dress. GM's registrations for the

CHEVROLET® mark are valid, unrevoked, and incontestable, and constitute *prima facie*

evidence of GM's exclusive ownership of the CHEVROLET® mark. [Doc. 1, Ver. Compl. ¶ 18]

12.     GM has registered many other trademarks with the United States Patent and

Trademark Office, including CHEVY®, U.S. Registration No. 1,494,385 (registered in 1988);

MONTE CARLO®, U.S. Registration No.1,040,089 (registered in 1986); BEL AIR®, U.S.

Registration No. 2,059,324 (registered in 1997); the CHEVROLET POLYGON LOGO®, U.S.

Registration No. 95,398 (registered in 1914):



and the CHEVROLET CHEVRONS LOGO®, U.S. Registration No. 1,540,658 (registered in

1989):



GM's Registrations of these marks are valid, unrevoked, and incontestable, and constitute *prima*

*facie* evidence of GM's exclusive ownership of such marks.  [Doc. 1, Ver. Compl. ¶ 19]

13.     GM has acquired trade dress rights in the inherently distinctive vehicle body

shapes of its world-famous CHEVROLET® vehicles, which are widely recognized.  The

distinctive shapes of GM's vehicles function as trademarks.  [Doc. 1, Ver. Compl. ¶ 20]

14.     Representative photographs of GM's MONTE CARLO® and BEL AIR®

vehicles are set forth below.  [Ex. A, Wells Decl. ¶ 5]



| 1957 Chevrolet Bel Air | 2000 Monte Carlo |
| --- | --- |

The design and trade dress of CHEVROLET® vehicles is non-functional.  This is evident from

the numerous alternative and custom golf car designs available on the market.  Indeed, websites

of selling golf cars with non-infringing designs include: WESTERGOLFCAR.COM;

EDDSGOLFCARTS.COM; DIVERSIFIEDGOLFCARS.COM; STRETCHPLASTICS.COM;

CLUBCAR.COM; RAINCUSTOM.ZOOVY.COM; TNTGOLFCAR.COM; and

STREETRODPRODUCTIONS.COM.  [Doc. 1, Ver. Compl. ¶ 20]

15.     GM has extensively employed and caused to be advertised and publicized

throughout the world the distinctive shapes and designs of its vehicles.  In addition, the

distinctive designs and shapes of GM's CHEVROLET® vehicles are immediately identifiable

and associated by the general public with GM and CHEVROLET®, and thus have acquired

secondary meaning. (The registered and common law trademarks identified above and the trade

dress in GM's CHEVROLET® vehicles are collectively referred to hereafter as "Chevrolet

Marks.") [Doc. 1, Ver. Compl. ¶ 21]

16.     GM prominently displays Chevrolet Marks, including the trade dress of its

distinctively shaped vehicles, in its advertisements.  [Doc. 1, Ver. Compl. ¶ 22]

17.     GM has continuously used Chevrolet Marks in connection with the promotion,

advertising, and sale of automobiles and other products and services since well before the acts of Defendants complained of in this litigation.  [Doc. 1, Ver. Compl. ¶ 23]

18.     GM has spent millions of dollars and has expended significant effort in advertising, promoting, and developing the Chevrolet Marks throughout the world.  As a result of such advertising and expenditures, GM has established considerable goodwill in the Chevrolet Marks.  The Chevrolet Marks have become world-famous and are distinctive.  The Chevrolet Marks are an invaluable asset of inestimable worth to GM. [Doc. 1, Ver. Compl. ¶ 24]

### Defendants' Violations of GM's Trademark and Trade Dress Right

19.     Subsequent to GM's and its predecessors' development and use of the Hummer Marks and Chevrolet Marks, and subsequent to their registration of the same, and without GM's consent, Defendants began using the Hummer Marks and Chevrolet Marks and trade dress, or confusingly similar versions of them, on and in connection with Defendants' products.  [Doc. 1, Ver. Compl. ¶ 25; Ex. C, BWC:36-39, 56-58, 81-83 & BWC EX. 8, 9]

20.     Defendants were previous licensees of GM's Chevrolet Marks.  [Doc. 17, Answer ¶ 26]  Defendants' license with GM for use of the Chevrolet Marks expired and was terminated in 2002.  [Ex. B, BWI:36-39, 56-58, 81-83]  Defendants, however, continued to falsely and misleadingly advertise on their website: "General Motors Trademark Licensed to Phat Cat Carts" located at http://www.phatcatcarts.com/golf_cart.html. [Doc. 1, Ver. Compl. ¶ 26]

21.     Defendants are in no way affiliated with, authorized, or sponsored by GM and have no authority to use the Hummer Marks nor the Chevrolet Marks to identify the products, services, or goods they advertise, promote, or sell.  The fact that Defendants were previous GM licensees and continue to hold themselves out as GM licensees is evidence of Defendants' intent to capitalize on and profit from GM's substantial goodwill.  Defendants' status as former

licensees also enhances the likelihood of confusion as to Defendants' true affiliation, authorization, and sponsorship by GM. [Doc. 1, Ver. Compl. ¶ 27]

22.     Despite their lack of affiliation, authorization, or sponsorship, Defendants unlawfully manufactured, marketed, and advertised golf car body kits, which were used to turn a golf car into a knockoff of HUMMER® and CHEVROLET® vehicles.  [Doc. 1, Ver. Compl. ¶ 28; Ex. C, BWC:38-39, 57-58]  Representative examples of Defendants' former advertisements on their Internet web site, showing photographic depictions of Defendants' golf car body kits, attached to the Verified Complaint as Exhibit "A," are set forth below:



"Hummer Kits"
Defendant's Website: http://www.phatcatcarts.com/hummer.html



"2000 Chevrolet Monte Carlo (Nascar Version)" Kit
Defendant's Website: http://www.phatcatcarts.com/clubcar.html




"1957 Chevrolet Belair" Kit
Defendant's Website: http://www.phatcatcarts.com/clubcar.html

Additionally, as evident from these photographic depictions, Defendants go out of their way to utilize counterfeits of badges and trademarks that GM uses on its genuine vehicles. Those badges and trademarks include the HUMMER GRILL®, the CHEVROLET POLYGON LOGO®, the CHEVROLET CHEVRONS LOGO®, the MONTE CARLO® badge, the BEL AIR® badge, and others. [Doc. 1, Ver. Compl. ¶ 28]

23.     Defendants misappropriated the Hummer Marks and Chevrolet Marks with actual knowledge of GM's prior adoption and use of the Hummer Marks and Chevrolet Marks. [Doc. 1, Ver. Compl. ¶ 31; Ex. C, BWC:56-58, 81-83]

24.     Although Defendants are neither licensees nor authorized dealers of GM, many of the products and services advertised, promoted, and sold by Defendants are of similar type and are intended for a similar purpose and a similar class of purchasers of HUMMER® and/or CHEVROLET® products and services. GM licenses products that compete with the products advertised and sold by Defendants. Specifically, GM licenses the Hummer Marks and Chevrolet Marks for use on golf cars. For example, LA Concept Cars, Inc. (LACONCEPTCARS.COM) is officially licensed to produce HUMMER® H1® and HUMMER® H2® golf cars; American

Custom Golf Cars, Inc. (CALIFORNIAROADSTER.COM) is officially licensed to produce

HUMMER® H3® golf cars; and Orange County Golf Carts Inc

(ORANGECOUNTYGOLFCARTS.COM) is officially licensed to produce 1957

CHEVROLET® BEL AIR® golf cars.  Because GM exercises close supervision of and sets high

standards for authorized HUMMER® and CHEVROLET® dealers and licensees, GM has a

strong interest in preventing unauthorized persons from using the Hummer Marks and Chevrolet

Marks in connection with the manufacture, sale, or advertisement of vehicles, parts, services, or

any other accessories. [Doc. 1, Ver. Compl. ¶ 33]

24.    Defendants' misappropriation of GM's Hummer Marks and Chevrolet Marks has

been carried out intentionally, without GM's consent.  [Doc. 44, Report & Recommendation at 6,

14-15 (finding that Defendants used GM's marks and trade dress intentionally and without GM's

consent)]  As such, Defendants' conduct constitutes intentional, fraudulent, malicious, willful,

and wanton infringement and dilution of GM's trademarks and trade dress.

25.    On November 1, 2006, this Court entered a Preliminary Injunction Order (Doc.

49) against Defendant Phat Cat and all of its officers, directors, agents, servants, employees,

attorneys, and all other persons in active concert or participation with Phat Cat.  In entering the

Preliminary Injunction Order, this Court found that Defendants' use of GM's protected marks

was likely to cause confusion.  [Doc. 44, Report & Recommendation at 7-8; Doc. 49,

Preliminary Injunction Order at 2 (adopting findings in Report & Recommendation)]   In so

doing, the Court rejected Defendants' argument that no reasonable consumer would confuse a

golf cart with an automobile, explaining that "it is sufficient for a plaintiff to show that the

unauthorized use of the trademark has the effect of misleading the public to believe that the user

is sponsored or approved by the plaintiff," and that GM "has shown that it is likely that the

public will be misled to believe that Defendant is sponsored or approved by [GM]." [Doc. 44, Report & Recommendation at 7] Specifically, the Court found that "Plaintiff has shown that a strong likelihood of confusion exists due to Defendant's continued use of Plaintiff's Hummer Marks and Chevrolet Marks after the termination of the license." [Doc. 44, Report & Recommendation at 7-8] The Court also noted that "the public would easily assume an association between Plaintiff and Defendant because Defendant holds itself out as a licensee of Plaintiff; it uses the trademark of Plaintiff's products on its golf carts and it has not disclaimed its disassociation with Plaintiff." [*Id.*]

25.     The Court also found that that "there is a likelihood of confusion between Defendant's golf cart kits and Plaintiff's Hummer and Chevrolet vehicles," and that "the two products have confusingly similar trade dress." [Doc. 44, Report & Recommendation at 9]

## ARGUMENT

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *International Stamp Art, Inc. v. United States Postal Service*, 456 F.3d 1270, 1273-74 (11th Cir. 2006) (quoting *Fed. R. Civ. P.* 56(c)). GM is entitled to judgment as a matter of law on its trademark infringement and dilution claims under the undisputed facts. This Court has already so found in granting GM's motion for preliminary injunction, and those same findings sustain GM's entitlement to judgment as a matter of law.

## I.      GM IS ENTITLED TO JUDGMENT ON ITS CLAIMS FOR INFRINGEMENT.

In order to prevail on its claims of trademark infringement under 15 U.S.C. § 1114, GM must prove that defendants (1) used its marks (2) in commerce (3) without its consent and (4)

that this unauthorized use was likely to deceive or cause confusion or mistake.  *Id.* § 1114(a).

"[T]he analysis of the Florida statutory and common law claims of trademark infringement . . . is

the same as under the federal trademark infringement claim." *Bavaro Palace, S.A. v. Vacation*

*Tours, Inc.*, 203 Fed.Appx 252, 256 (11th Cir. 2006) (additional quotation and citations omitted).

There is no dispute that Defendants used the GM marks in commerce without GM's

consent.  As this Court noted in granting GM's motion for preliminary injunction, Brian Wilson

has "freely admitted" using protected GM marks in commerce—through advertising on his

internet site, and through flyers, magazines, and even a television program—"even though he

knew that the licensing agreement had been terminated." [Doc. 44, Report & Recommendation at

6; Ex. C, BWC:36-39, 56-58, 81-83]

## A.      GM is Entitled to the Benefit of a Presumption of a Likelihood of Confusion

In many cases, a likelihood of confusion can be established only by evaluating the degree

of similarity between two distinct marks in light of a multi-factored inquiry into the extent of

relatedness, overlap in marketing channels, characteristics of potential purchasers, etc. (*e.g.*, the

use of the mark "Delta" by Delta Airlines and Delta Faucets).  Such multi-factored balancing is

unnecessary, however, in cases like this one where the defendant has misappropriated precise

counterfeits of the plaintiff's trademarks on goods that are related to the trademark holder's own

goods.  Under Eleventh Circuit precedent, "[t]here can be no dispute that the parties' concurrent

use of the [same] mark poses a substantial likelihood of confusion among consumers."  *Int'l*

*Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1249-50 (11th Cir.

2002); *see also Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1191 (6th Cir. 1988) (indicating

"'[c]ases where a defendant uses an identical mark on competitive goods . . . are "open and

shut"'" cases that do not require "'protracted litigation to determine liability for trademark

infringement'"); *Polo Fashions v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) (presumption arises when counterfeit symbols are substantially identical to genuine symbols and are used in the same manner as genuine symbols); *Dive N Surf, Inc. v. Anselowitz*, 834 F. Supp. 379, 382 (M.D. Fla. 1993) (where marks are "substantially similar as to both design and use[,] . . . the court presumes that defendant's counterfeit items caused public confusion in the marketplace").

As Professor McCarthy has explained, once a licensing agreement has been terminated, "[c]ontinued use by a former franchisee, dealer or licensee of the mark constitutes a fraud on the public, since they are lead to think that the continuing user is still connected with the trademark owner."  4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:47 (4th ed.) (hereinafter "*McCarthy*").  In other words, "[c]ommon sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492-93 (11th Cir. 1983).  Therefore, as a matter of law, a strong likelihood of confusion exists when a former licensee persists in using a trademark after the license to do so has been revoked.  *Bunn-O-Matic Corp. v. Bunn Coffee Servs., Inc.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) ("The likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license."); *Sunsport Inc. v. Barclay Leisure Ltd.* 984 F. Supp. 418, 422 (E.D. Va. 1997) (holding that when a former licensee continues to use the licensor's mark, there is a presumption of infringement).

It is undisputed that Defendants are terminated licensees of the Chevrolet Marks.  [Doc. 44, Report & Recommendation ¶ 8 at 4; Ex. B, BWI:35]  Moreover, defendant Wilson has admitted that his company held itself out as affiliated with GM, when in fact it is not. [Doc. 44, Report & Recommendation at 6; Ex. C, BWC:81-83 & BWC EX. 8, 9]  Thus, it is equally

obvious that Defendants inevitably confuse customers.  Defendants entered into the licensing

agreement with GM in the first place because they recognized the economic value of associating

their business with the considerable goodwill developed by GM in the Chevrolet Marks.  Indeed,

prior to this Court's issuance of a preliminary injunction, Defendants continued to deceptively

hold themselves out as GM trademark licensees on their website.  [Doc. 44, Report &

Recommendation ¶ 10 at 4]  After cultivating the consumer mindset for several years, the

continued use of the Chevrolet Marks will inevitably lead consumers to falsely believe that a

relationship persists between GM and Defendants.

In entering the preliminary injunction in this case, this Court properly found that

Defendants' use of GM's protected marks was likely to cause confusion—despite Defendants'

argument that no reasonable consumer would confuse a golf cart with a car. [Doc. 44, Report &

Recommendation at 7-8]  Given the close relatedness of the parties' goods and the precise

counterfeiting of the Hummer Marks and Chevrolet Marks, the likelihood of confusion is

presumed.  As Magistrate Judge Scriven explained, "the public would easily assume an

association between Plaintiff and Defendant because Defendant holds itself out as a licensee of

Plaintiff; it uses the trademark of Plaintiff's products on its golf carts and it has not disclaimed its

disassociation with Plaintiff."  [*Id.*]  For the same reasons, GM is entitled to judgment as a matter

of law on its trademark infringement claims.

**B.      The Likelihood of Confusion is Equally Established by the Traditional Factors.**

Although an application of the traditional factors for determining likelihood of confusion

is unnecessary in this case, the analysis nevertheless confirms that a preliminary injunction

should be granted.  Where likelihood of confusion is not presumed, the following factors are

considered: "(1) type of mark, (2) similarity of mark, (3) similarity of the products the marks

represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997).  Under the seven-factor likelihood of confusion analysis of *Lone Star*, "there are no set rules as to how much evidence of confusion is needed; rather, a district court 'must take into consideration the circumstances surrounding each particular case.'" *Lone Star*, 122 F.3d at 1382 (citation omitted).

In this case, these factors weigh heavily in favor of the likelihood of confusion.

*(1) Type of mark.*  "Classifying the type of mark Plaintiff has determines whether it is strong or weak." *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).  "There are four categories of marks: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary." *Id.*  "An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., 'Sun Bank' is arbitrary when applied to banking services)." *Id.*  "Arbitrary marks are the strongest of the four categories." *Id.* at 1335-36.  "[I]f a mark is 'incontestable,' that is, if it has been registered for five years with the Patent & Trademark Office . . . then the mark's incontestability serves to enhance its strength." *Id.* at 1336.  Clearly, the Hummer Marks and Chevrolet Marks are "strong" trademarks.  The words HUMMER®, CHEVROLET®, CHEVY®, MONTE CARLO®, and BEL AIR® are arbitrary when applied to vehicles and were registered well over five years ago.  [Doc. 1, Ver. Compl. ¶¶ 8-21]  Moreover, as noted above, the HUMMER® and CHEVROLET® trade dress are highly distinctive—even world-famous. Without dispute, the strength factor weighs heavily in favor of GM.

*(2) Similarity of marks.*  "Here, the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling*, 192 F.3d at 1337.  The similarity of Defendants' knockoff golf car body

kits to GM's HUMMER® and CHEVROLET® vehicles is blatantly obvious.  Defendants

advertised their golf car body kits as "Hummer Kits," "2000 Chevrolet Monte Carlo" kits, and

"1957 Chevrolet Belair" kits.  [Doc. 1, Ver. Compl. ¶ 1]  Furthermore, as described above,

Defendants used precise counterfeits of the Hummer Marks and Chevrolet Marks on their golf

cars.  [Doc. 1, Ver. Compl. ¶ 28]  Thus, this factor weighs heavily in favor of GM.

  *(3) Similarity of the products the marks represent.*  "This factor requires a determination

as to whether the products are the kind that the public attributes to a single source, not whether or

not the purchasing public can readily distinguish between the products of the respective parties."

*Frehling*, 192 F.3d at 1338.  The close relatedness of the parties' products is not in dispute.

Indeed, GM officially licenses its Hummer Marks and Chevrolet Marks to custom golf car

manufacturers.  [Doc. 1, Ver. Compl. ¶ 33]  These official licensees produce licensed

HUMMER® and CHEVROLET® golf cars—the very same products that Defendant produces

without a license.  Thus, this factor weighs strongly in favor of GM.

  *(4) Similarity of the parties' retail outlets and customers.*  "This factor takes into

consideration where, how, and to whom the parties' products are sold."  *Frehling*, 192 F.3d at

1339.  "Direct competition between the parties is not required for this factor to weigh in favor of

a likelihood of confusion . . . .  The parties' outlets and customer bases need not be identical, but

some degree of overlap should be present."  *Id.*  Defendants' principal marketing channel is their

internet website. [Doc. 1, Ver. Compl. ¶¶ 26, 28]  GM also uses this important channel in

operating its own website selling HUMMER® and CHEVROLET® vehicles—at

HUMMER.COM and CHEVROLET.COM—to advertise and promote its own products.

Furthermore, GM's golf car licensees also use and operate websites to sell their officially

licensed golf cars.  [Doc. 1, Ver. Compl. ¶ 33]  Thus, there is an important overlap in the

customer base of the parties—internet users.  This factor accordingly weighs in favor of a likelihood of consumer confusion.  *See Paccar, Inc. v. Telescan Technologies, L.L.C.*, 115 F.Supp.2d 772, 778 (E.D. Mich. 2000) ("simultaneous use of the Internet as a marketing and advertising tool renders it more likely that customer confusion will result"), *aff'd in relevant part*, 319 F.3d 243, 254 (6th Cir. 2003).

(5) *Similarity of advertising media used.*  "This factor looks to each party's method of advertising."  *Frehling*, 192 F.3d at 1339.  As stated in the analysis of the previous factor, Defendants' and GM's and GM's official licensees' method of advertising—use of an internet website to promote HUMMER® and CHEVROLET® golf cars—has substantial overlap.  This clearly indicates that Defendant uses the same advertising media—the internet—to advertise its knockoff golf car body kits, directly competing in the same media with authorized and licensed golf car manufacturers.  Thus, this factor weighs strongly in GM's favor.

(6) *Defendant's intent.*  "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity."  *Frehling*, 192 F.3d at 1340.  There is no dispute that Defendants intended to copy GM's trademarks and trade dress. [Doc. 44, Report & Recommendation ¶ 11 at 4]  Defendants admit that they held themselves out as an official GM licensee. [*Id.* ¶ 10 at 4]  Second, Defendants expressly touted their golf car kits as "Hummer Kits", "2000 Monte Carlo" kits, and "1957 Chevrolet Belair" kits.  [Doc. 1, Ver. Compl. ¶ 1]  Third, Defendants carefully and precisely counterfeited the Hummer Marks and Chevrolet Marks on their golf car body kits.  [Doc. 1, Ver. Compl. ¶ 28]  The overwhelming evidence of Defendants' intent to poach GM's substantial fame and goodwill in its HUMMER® and CHEVROLET® trademarks and trade dress weighs strongly in GM's favor and should be

sufficient, in and of itself, for GM to prevail in this matter.

*(7) Actual confusion.*   "It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion. However, such evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case." *Frehling*, 192 F.3d 1340.   "[D]ue to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant." *Pita Delight, Inc. v. Salami*, 24 F. Supp.2d 795, 801 (E.D. Mich. 1998).

## II.       GM IS ENTITLED TO JUDGMENT ON ITS TRADE DRESS CLAIMS.

The Eleventh Circuit has recognized that "the design of a product itself may constitute protectable trade dress under § 43(a) of the Lanham Act." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983).   "In order to prevail on [a] claim for trade dress infringement . . . [a plaintiff] must prove that (1) the product design of the two products is confusingly similar; (2) the features of the product design are primarily non-functional; and (3) the product design is inherently distinctive or has acquired secondary meaning." *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1202 (11th Cir. 2004) (citing *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996)).   Each of these elements is easily established by the undisputed facts in the record.

## A.       Defendants' Golf Cart Designs are Confusingly Similar to GM's Vehicles.

The confusing similarity between Defendants' golf cart designs and GM's world-famous vehicles is evident upon a simple side-by-side comparison:

| Phat Cat's "HumVee Kit" | HUMMER® trade dress |
|---|---|



| Phat Cat's "'57 kit" | 1957 Chevrolet Bel Air |



| Phat Cat's "2000 Monte (Nascar Version)" | 2000 Monte Carlo |

[Ex. A,, Wells Decl. ¶¶ 2-4]

Again, the confusing similarity between the parties' vehicles is hardly coincidental.

Defendants' entire business strategy is built around their intentional, careful copying of GM's

trade dress and trademarks.  [Ex. C, BWC:39, 56-58, 81-83, 90, 96-97 & BWC EX. 8, 9

(defendant Wilson admitting that he manufactured and sold golf carts with Chevrolet marks and

sold carts with Hummer marks)]  Indeed, this Court has already found that "there is a likelihood

of confusion between Defendant's golf cart kits and Plaintiff's Hummer and Chevrolet vehicles,"

or in other words that "the two products have confusingly similar trade dress."  [Doc. 44, Report

& Recommendation at 9]

**B.      The HUMMER® and CHEVROLET® Trade Dress is Nonfunctional.**

The HUMMER® and CHEVROLET® trade dress are nonfunctional.  The United States

Supreme Court has explained that "a design is legally functional, and thus unprotectable, if it is

one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." *Two Pesos v. Taco Cabana, Inc.*, 505 U.S. 763, 775 (1992).

This Court's analysis in granting GM's motion for preliminary injunction establishes the nonfunctionality of GM's trade dress and is equally applicable here:

> First, in the Verified Complaint Plaintiff established that the Hummer Marks and the Chevrolet Marks are not essential to the use or purpose of its vehicles, but are merely aesthetic in nature. (Dkt. 1, ¶¶ 8, 13, 14, 20) In fact, the overall appearance of Plaintiff's vehicles distinguish them from competitors' vehicles. Id. Furthermore, Plaintiff has shown that the same conclusion of non-functionality is appropriate in the context of knockoff golf carts and golf cart body kits as is evident from the numerous alternative custom golf cart designs available on the market. (Dkt.1, ¶¶ 14, 20) Plaintiff has offered evidence that similar product features have been designated as non-functional. *General Motors Corp. v. Let's Make a Deal*, 223 F. Supp.2d 1183 (D. Nev. 2002) (finding the Hummer trade dress on the defendant's replica car kits non-functional).

[Doc. 44, Report & Recommendation at 10]

In granting GM's preliminary injunction motion, this Court also noted that Defendants had failed to rebut GM's showing of nonfunctionality. [*Id.*]  The will hold true at this stage: Defendants still cannot "present any evidence … that suggest[s] the golf cart body features [misappropriated from GM] are functional." [*Id.*]

**C.    The HUMMER® and CHEVROLET® Trade Dress Are Distinctive.**

Finally, the record easily sustains the distinctiveness and famousness of the HUMMER® and CHEVROLET® trade dress.  As the Court found in entering the motion for preliminary injunction in this case:

> Plaintiff has extensively employed the HUMMER® and CHEVROLET® trade dress and caused it to be advertised throughout the world. As such, the distinctive design and shape of its vehicles are immediately identifiable and associated by the general public with Plaintiff, and thus its trade dress has acquired secondary meaning . (Dkt. 1, ¶¶ 15, 21) Furthermore, Plaintiff and its predecessors have spent hundreds of millions of dollars and have expended significant effort in advertising and promoting authorized CHEVROLET® and HUMMER® products in developing the Chevrolet Marks and

Hummer Marks throughout the world. (Dkt. 1)

[Doc. 44, Report & Recommendation at 11]  For the reasons already embraced by this Court,

GM "has made a sufficient showing that it can prove all four elements of its trade dress

infringement claim against Defendant."  [*Id.*]

## III.     GM IS ENTITLED TO JUDGMENT ON ITS DILUTION CLAIM.

In order to succeed establish trademark dilution, GM need only show that its trademarks

are "famous" and that Defendants' use is "likely to cause dilution" of those marks.  15 U.S.C. §

1125(c) (as amended by the Trademark Dilution Revision Act of 2006 ("TDRA")).  Although

the statute used to require proof of "actual dilution," *see Moseley v. V. Secret Catalogue*, 537

U.S. 418, 123 S. Ct. 1115, 1125 (2003), it was recently amended to substitute the "likelihood of

dilution" standard.

The undisputed facts in the record easily establish the famousness of the Chevrolet and

Hummer marks.  As this Court found in granting GM's preliminary injunction motion, there is

"ample evidence in the Verified Complaint and [presented] at the evidentiary hearing" that

establish the famousness of these trademarks.  Defendants' likelihood of dilution of the GM

trademarks is equally undisputed.  Brian Wilson has admitted that he and Phat Cat have used

GM's HUMMER® and CHEVROLET® marks in marketing and selling their golf carts and golf

cart body kits. [Doc. 44, Report & Recommendation at 13; Ex. C, BWC:36-39, 56-58, 81-83 &

BWC EX. 8, 9]  These acts are easily enough to establish the likelihood of dilution.

Indeed, in granting GM's motion for preliminary injunction, this Court found that proof

that a "defendant used identical trademarks constitutes circumstantial evidence sufficient to

support a finding of actual dilution."  [Doc. 44, Report & Recommendation at 12.]  If GM's

"showing in this regard constitutes circumstantial evidence sufficient to prove actual dilution,"

[*id.*], then that showing is also sufficient to establish a likelihood of dilution under the TDRA.

## IV.   THE COURT SHOULD ENTER A PERMANENT INJUNCTION, AWARD GM TREBLE DAMAGES, AND ATTORNEY FEES AND COSTS.

Because there is no dispute that Defendants have violated GM's trademark and trade

dress rights, this Court has preliminarily enjoined Defendants' from continuing to carry out their

unauthorized infringement and dilution.  [Doc. 49, Preliminary Injunction Order]  Given the lack

of dispute regarding the Defendants' past conduct, this Court should enter permanent injunctive

relief substantially in the same form as the Preliminary Injunction Order.

In addition, since GM has established violations of its trademark rights, GM "shall be

entitled . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3)

the costs of the action."  15 U.S.C. § 1117(a).  Moreover, "[t]he court in exceptional cases may

award reasonable attorney fees to the prevailing party."  *Id.* Finally, "[i]n assessing damages . . .

the court shall, unless the court finds extenuating circumstances, enter judgment for three times

such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the

case of any violation . . . that consists of intentionally using a mark or designation, knowing such

mark or designation is a counterfeit mark . . ."  15 U.S.C. § 1117(b).  *See also, Chanel, Inc. v.*

*Italian Activewear of Florida, Inc.,* 931 F.2d 1472, 1476-1477 (11th Cir. 1991) (holding that

award of treble damages and attorneys' fees is mandatory where infringement is intentional).

In this case, there is no dispute that the Defendants intentionally infringed and diluted

GM's trademarks and trade dress, or that Defendants used counterfeits of GM's marks as badges

on Defendants' golf carts.  This Court has already entered such findings based upon Defendants'

own admissions.  [Doc. 44, Report & Recommendation ¶¶ 10, 11 at 4 (finding that Defendants

admit to intentional and unauthorized use of GM's trademarks and trade dress)]  There is further,

undisputed evidence that Defendants continued to violate GM's trademark and trade dress rights,

willfully and intentionally, even in the face of this Court's Preliminary Injunction Order.  [Ex. D,

Doc. 65, Transcript of Contempt Hearing, March 9, 2007 at 75-78 (Oral Report &

Recommendation in which Magistrate Judge Scriven found that Defendants intentionally

violated Preliminary Injunction Order by infringing and counterfeiting GM's trademarks and

trade dress); Doc. 63, Order Adopting Oral Report & Recommendation and Granting Motion for

Contempt Sanctions]

Accordingly, there can be no dispute that GM is entitled to all the remedies provided for

in Section 1117, including a monetary award equal to triple the amount of Defendants' wrongful

profits, along with GM's attorneys' fees and costs.

## CONCLUSION

For all of these reasons, GM is entitled to judgment as a matter of law on all of its claims.


By: s/Gregory D. Phillips_____
Gregory D. Phillips
Scott R. Ryther
Thomas R. Lee, Of Counsel
HOWARD PHILLIPS & ANDERSEN
560 East 200 South, Suite 300
Salt Lake City, UT 84102
Phone: 801-366-7471

Armando Rubio, Of Counsel
SEIPP, FLICK & KISSANE, LLP
Two Alhambra Plaza, Suite 800
Coral Gables, FL 33134
Tel:  (305) 995-6094
Fax: (305) 995-6100

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on June 1, 2007, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic

filing to the following:

      **William John Gadd**
      wjohngaddesq@yahoo.com,brmazahe@yahoo.com

      **Bernard R. Mazaheri**
      brmazahe@yahoo.com

                    /s/ Julianne Partridge
                    HOWARD, PHILLIPS, & ANDERSEN